Bernard POGOSTIN, Ann Brown and
Irwin J. Newman, Plaintiffs
Below, Appellants,

v.

W. Thomas RICE, Eliot H. Stein, Fred
Sullivan, A. Lightfoot Walker, Arthur
C. Babson, Francis L. Cappaert, Edwin
I. Hatch, Peter C. Huang, George T.
Scharfenberger, Joe E. Lonning, Daniel
E. Lyons, Stephen E. O'Neil, Eben W.
Pyne, John H. Washburn and City In-
vesting Company, Defendants Below,
Appellees.

Supreme Court of Delaware.

Submitted: Jan. 9, 1984.

Decided: June 21, 1984.

Victor F. Battaglia, Samuel R. Russell, Biggs & Battaglia, Wilmington; Mordecai Rosenfeld (argued) Mordecai Rosenfeld, P.C., New York City, for appellants.

R. Franklin Balotti, Richards, Layton & Finger, Wilmington; Max S. Schulman, (argued) Cravath, Swaine & Moore, New York City, for individual appellees.

H. Murray Sawyer, Jr., H. Murray Sawyer, Jr., P.A., Wilmington, for appellee City Investing Company.

Before McNEILLY, MOORE and CHRISTIE, JJ.

MOORE, Justice:

This stockholder derivative suit, brought on behalf of City Investing Company ("City"), was dismissed by the Court of Chancery for plaintiffs' failure either to make a demand upon City's board of directors for appropriate corrective action, or to allege with particularity that demand was futile, pursuant to Del.Ch.Ct.R. 23.1.[1] The defendants are City and its board of directors, consisting of four company officers and ten outsiders. Plaintiffs charge that City's board wrongfully rejected a tender offer for its shares, resulting in the alleged loss by its stockholders of a substantial premium over market. It also is contended that the increase in the market price for City's shares, created by the tender offer, resulted in excessive payments to the four officer-directors under a pre-existing compensation plan keyed to the market price.

Upon the defendants' motion to dismiss, the Vice Chancellor found plaintiffs' allega-

tions to be conclusory and lacking the particularity mandated by Chancery Rule 23.1. We agree with that result based on the principles stated by us in *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984). Under the *Aronson* test we are satisfied that the allegations in the complaint fail to create a reasonable doubt that the outside directors of City were entitled to the protections of the business judgment rule. We therefore affirm.

## I.

Our analysis begins with the allegations of the complaint, taking all well pleaded averments as true. *Aronson v. Lewis*, 473 A.2d at 815.

The issues evolve from a tender offer, totaling $1.1 billion, made for City's stock in June 1980 by Tamco Enterprises, Inc. (Tamco) at $32.50 per share. Just before Tamco's offer City's stock traded at $20 on the New York Stock Exchange. The company has approximately 40,900 shareholders.

The Tamco tender offer was rejected by City's board on July 23, 1980. Immediately thereafter the price of City's stock, which had been selling in the high 20's, declined. It is alleged that the board acted imprudently and improperly in rejecting the offer without any proper business purpose, thereby breaching the fiduciary duty owed the stockholders and denying them the substantial premium offered. More specifically, it is claimed that the defendants wrongfully refused to negotiate with Tamco for the improper reason that the four inside directors wanted to "retain control of the company, and continue to receive their sub-

---

1. Chancery Rule 23.1, similar to Fed.R.Civ.P. 23.1, provides in pertinent part:

   In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share of membership thereafter devolved on him by operation of law. The complaint *shall* also *allege with particularity* the efforts, if any, made by the plaintiff to obtain the action he desired from the directors or comparable authority *and the reasons for his failure to obtain the action or for not making the effort.*

   Del.Ch.Ct.R. 23.1 (Emphasis added).

stantial benefits." However, plaintiffs advise us that this claim is of secondary import to their other cause of action relating directly to the payment of executive bonuses.

As to the latter, it is alleged that in 1971, nine years prior to the tender offer, City, with stockholder approval, had adopted an arrangement for executive compensation, called the Share Unit Plan (the Plan), under which bonuses were awarded in cash, stock, or a combination thereof, to designated employees. The sum ultimately to be paid is based on a pre-existing timetable relative to the market price of City stock. The theory of the plan is that the stock market will reflect successful managerial performance. Thus, when share units are awarded, their value, and the amount ultimately to be paid, are keyed to the price of City's stock as of a later time. Each unit is equivalent to one share of common stock. One-fifth of the units vest in each of the five years after the grant date, and on the fifth anniversary of the grant date, when all units vest, the grantee has the right to receive a cash payment equalling the increase in the market value of the stock from the grant date, plus the assumed reinvestment of non-common stock dividends declared during that five-year period. This reinvestment figure is the market value of the number of common shares represented by the value of the dividends paid over the market value of a share of common stock.

Plaintiffs contend that after the Tamco offer was received and rejected, bonuses were calculated under the Plan at $26 per share, the average market price from June to September 1980. This resulted in abnormally large payments to the four inside directors, based on artificially inflated stock prices caused by heavy trading during the tender offer.

It is claimed that the large payments made to the four officer-directors were not a reward for successful managerial performance, but solely the result of market fluctuations unrelated to the Plan's purpose. The relief sought includes assessment of damages against all directors. The complaint states that demand on the City board was excused as futile because "[e]ach of the directors participated in the wrongs alleged, and each is liable therefor" and "[t]he directors could not and would not sue themselves."

To the claim that the defendants wrongfully rejected the Tamco offer, the defendants reply that the City board appointed a special committee of outside directors to consider the tender offer. None of these outside directors were eligible to participate in the Plan, and there are no allegations that they had a financial stake in opposing the tender offer. The committee, in turn, hired two investment banking firms, Blyth, Eastman, Paine, Webber, Inc. and the First Boston Corporation, to prepare valuation studies of City. These firms spent nearly one month analyzing City and the offer. City's officer-directors were not on the special committee, and they did not participate in the valuation decisions of the investment bankers.

At a board meeting held on July 23, 1980, the special committee reported its conclusions that the Tamco price was too low, that the market had undervalued City's assets, and that City stock was actually worth approximately $48 per share. Committee members and other directors not on the committee then discussed the tender offer. It appears that the majority of the board had no personal financial interest under the Plan and plaintiffs do not question the independence of these directors. Ultimately, the board voted unanimously to reject the Tamco offer as not in the best interests of City and its shareholders.

As to the Plan, defendants argue that such compensation arrangements are matters of business judgment. They also note that the Plan was approved by City shareholders in 1971, nine years before the Tamco tender offer.

Defendants contend that demand was not excused, because the plaintiffs' claims of futility are facially insufficient. The defendants argue that bare allegations of di-

rector participation in the wrongdoing do not meet the particularity requirement of Rule 23.1, as no facts are alleged indicating bias, self-interest, or other impropriety by City's board. According to defendants, an allegation of futility, based on a claim of director reluctance to bring suit against themselves, has no merit because it would entirely circumvent the demand requirement of Rule 23.1. Finally, the defendants argue that the naked allegation of board liability for rejecting the tender offer does not excuse demand, because no particularized facts are alleged which suggest any reasonable basis upon which City's board might be subject to personal liability.

## II.

The bedrock of the General Corporation Law of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board. *See* 8 *Del.C.* § 141(a). It follows that the existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders. *Aronson v. Lewis*, 473 A.2d at 811 [citing *Loft, Inc. v. Guth*, Del.Ch., 2 A.2d 225 (1938), *aff'd*, Del.Supr., 5 A.2d 503 (1939)]. Balanced against the managerial power of directors is the derivative action enabling shareholders to sue on behalf of the corporation where those in control of the enterprise refuse to assert a claim belonging to it. The derivative action is one method by which shareholders may obtain redress for the misuse of managerial power.

However, because the derivative action impinges on the managerial freedom of directors, the law imposes certain prerequisites to the exercise of this remedy. Thus, the requirement of Chancery Court Rule 23.1 exists at the threshold to prevent abuse and to promote intracorporate dispute resolution. Inextricably bound to threshold questions of demand futility are issues of business judgment, and the standards by which director action is measured. *Aronson*, 473 A.2d at 812–816.

The test for determining demand futility reflects the interrelationship of business judgment, director independence and interest. It requires a bifurcated factual analysis based upon a reasonable doubt standard. Under the demand futility test, the facts alleged in the complaint are examined to determine whether they create a reasonable doubt that: (1) the directors are disinterested and independent and (2) the challenged transaction otherwise was the product of a valid exercise of business judgment. *Id.* at 814. As to the first *Aronson* inquiry, the court reviews the factual allegations of the complaint to determine whether they create a reasonable doubt as to the disinterestedness and independence of the directors at the time the complaint was filed. Those questions are measured in relation to certain basic or fundamental principles. Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders. *Id.* at 812. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction. *Id.* at 814, 816.

The second, or business judgment inquiry of *Aronson*, focuses on the substantive nature of the challenged transaction and the board's approval thereof. A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board. Rather, the transaction is reviewed against the factual background of the complaint to determine whether a reasonable doubt exists at the threshold that the challenged action was a valid exercise of business judgment. *Id.* at 814. If the Court of Chancery in the exercise of its sound discretion is satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt as to either aspect of the

*Aronson* analysis, the futility of demand is established and the court's inquiry ends.

Thus, the *Aronson* test examines the alleged wrong to the corporation in relation to issues of independence, interest, and the exercise of business judgment by the directors. The reasonable doubt standard in conjunction with the particularity requirement of Rule 23.1 strikes the essential balance between avoiding abuse of the derivative action and forcing a plaintiff to plead evidence without the benefit of discovery.

■ Accordingly, we focus on the plaintiffs' charges regarding the Plan and defendants' rejection of the Tamco tender offer. In so doing, we note that the plaintiffs' bootstrap allegations of futility, based on claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue themselves, were laid to rest in *Aronson,* 473 A.2d at 815, 818.

### III.

In assessing plaintiffs' attack on the payments made under the Plan we begin with an analysis of the applicable statutory framework relative to matters of executive compensation. Section 141(h) of the General Corporation Law of Delaware expressly authorizes directors to fix their remuneration. 8 *Del.C.* § 141(h). Under Section 122(5) a corporation may compensate its officers and agents, and Section 122(15) provides for stock option, incentive, and other compensation plans for directors, officers, and employees. 8 *Del.C.* § 122(5), (15). *See also* Folk, The Delaware General Corporation Law, §§ 122, 141 (1972). In addition, Section 157 confers broad discretion upon directors in the issuance of stock options and rights. Moreover, it makes clear that absent "actual fraud", the judgment of the directors as to the consideration for such options or rights is conclusive. 8 *Del.C.* § 157. Section 157 was enacted to "protect directors' business judgment in consideration inuring to the corporation in exchange for creating and issuing stock options." *Michelson v. Duncan,* Del.Supr.,

407 A.2d 211, 224 (1979). In *Michelson,* we held that Section 157 did not bar a claim for waste of corporate assets in the cancellation and reissuance of stock options where the claim was an absolute lack of consideration, rather than inadequate consideration. *Id.* In so holding, we stated that implicit in Section 157 is a requirement of some consideration extant in a stock option plan, and that the existence of such consideration will not be assumed in passing upon a waste of assets claim. *Id.*

■ The consideration typically involved in stock options, i.e., continued and greater efforts by employees, is ephemeral and not susceptible of identification and valuation in dollar terms. *Beard v. Elster,* Del.Supr., 160 A.2d 731, 736 (1960) (use of term "consideration" to identify benefit corporation receives from stock option plan was "ill-advised" because consideration implies some measurable quid pro quo); *Lieberman v. Becker,* Del.Supr., 155 A.2d 596, 600 (1959). The consideration, in the sense of a legal validation device, implicit in all stock option plans is "the requirement that [all stock option plans] contain conditions or that surrounding circumstances are such, that the corporation may reasonably expect to receive the contemplated benefit from the grant of options." *Beard,* 160 A.2d at 737. *See Gottlieb v. Heyden Chem. Corp.,* Del.Supr., 90 A.2d 660, 664–66 (1952); *Kerbs v. California Eastern Airways,* Del.Supr., 90 A.2d 652, 657–58 (1952). In addition, there must be a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted. *Id.*

In this action, the essence of plaintiffs' claim is that the substantial sums which became due under the Plan were materially affected by the unrelated Tamco tender offer, and were not a reward for successful managerial performance. The plaintiffs therefore argue that permitting and accepting the payments were breaches of fiduciary duty. *Compare Forman v. Chesler,* Del.Supr., 167 A.2d 442, 445–46 (1961) (warrants and options provide no incentive if

grantee cannot take advantage of appreciation in market price).[2]

However, it is undisputed that the Plan was adopted by a majority of disinterested directors and later ratified by City shareholders in 1971. There is no charge of inadequate disclosure in the proxy materials. Under the circumstances plaintiffs have the burden of demonstrating by particularized allegations that the Plan itself is so devoid of a legitimate corporate purpose as to be a waste of assets. *See Michelson v. Duncan,* 407 A.2d at 224–225. They have not done so.

Moreover, the Plan is administered by a committee of four outside directors who are themselves ineligible to participate therein. The Plan, as shown by its terms, represents a legitimate attempt to come within the factual context and legal standards of *Beard* and *Lieberman. See Beard,* 160 A.2d at 737–39; *Lieberman,* 155 A.2d at 597–99. Like *Lieberman,* the Plan is tied to the vagaries of the market, but *Lieberman* laid to rest any objection to the link between employee efforts and market price. *Lieberman,* 155 A.2d at 599. Furthermore, *Lieberman* established that the benefit received under incentive plans is not susceptible of valuation for purposes of determining the validity of such plans. *Id.* at 600. Plaintiffs' arguments suggest no helpful standard, claiming only that these payments were patently invalid. Given the additional fact that the market appreciation aspect of the Plan was entirely disclosed to the City shareholders in 1971 when they approved it, we conclude that the plaintiffs have failed to allege facts under the *Aronson* test which would excuse demand. *Aron-*

son, 473 A.2d at 815. *See Lieberman,* 155 A.2d at 601. If anything the Plan by its terms provided reasonable assurance that City would receive the benefits contemplated by it—the continued services of key employees. The benefit of the services of these employees is illustrated by the growth of City's assets from $340 million in 1968 to almost $7.7 billion in 1980 and by City's stock price, which has reached the low thirties on numerous occasions in the three years since the Tamco offer. We also conclude that plaintiffs have failed to allege facts creating a reasonable doubt regarding the independence and disinterestedness of the City board. *See Aronson,* 473 A.2d at 814. Only the four officer-directors of the fourteen member City board are beneficiaries of the Plan. Plaintiffs do not allege control by these four insiders, nor do they claim that the remaining ten directors have any financial or other interest whatsoever in the Plan. Given the existing legal principles applicable to matters of executive compensation, and the enumerated voids in the pleadings, we must conclude that demand was not excused.

## IV.

Apart from the executive compensation claims, the plaintiffs challenge the rejection of the Tamco tender offer by the City board. They claim that the directors refused to negotiate with Tamco, or to accept the Tamco premium, solely because the four insiders sought to retain control of City and continue to receive their substantial benefits under the Plan. Plaintiffs also argue that the board had no proper business purpose for rejecting the tender offer.

---

**2.** In this respect, plaintiffs' challenges to the Plan are similar to the numerous federal actions brought under section 36(b) of the Investment Company Act of 1940 (ICA) attacking management fees paid to mutual fund advisors. *See, e.g., In re Kauffman Mutual Fund Actions,* 479 F.2d 257 (1st Cir.1973). *Cf. Saxe v. Brady,* Del. Ch., 184 A.2d 602, 610 (1962); *Meiselman v. Eberstadt,* Del.Ch., 170 A.2d 720, 723 (1961). In these suits, mutual fund directors were attacked for failing to reduce the percentages used to

calculate advisor compensation in light of changing economic conditions. Mutual fund shareholders alleged that the demand under Fed.R.Civ.P. 23.1 was excused because fund directors had approved the advisor fee arrangements. Recently, the United States Supreme Court abrogated the demand requirement for ICA actions. *Daily Income Fund, Inc., et al. v. Fox,* —— U.S. —— at ——–——, 104 S.Ct. 831, at 842, 78 L.Ed.2d 645 (1984).

According to plaintiffs, the board's action was a breach of fiduciary duty, and therefore, is not a valid exercise of business judgment.

In *Aronson,* 473 A.2d at 812–816, we discussed the availability, function and operation of the business judgment rule, including the standards by which director conduct is judged. What we said there is equally applicable here in the context of a takeover. *Gimbel v. Signal Cos., Inc.,* Del.Ch., 316 A.2d 599, *aff'd,* Del.Supr., 316 A.2d 619 (1974). *Accord Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 759 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 295 (7th Cir.1981) (applying Delaware law); *Treadway Cos., Inc. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980); *Crouse-Hinds Co. v. Inter-North, Inc.,* 634 F.2d 690 (2d Cir.1980); *Johnson v. Trueblood,* 629 F.2d 287 (3d Cir.1980) (applying Delaware law).

■■■■ Thus, an informed decision to reject a takeover proposal, hostile or friendly, will not excuse demand absent particularized allegations of a breach of fiduciary duty, such as self-dealing, fraud, overreaching, or lack of good faith. Where, for example, allegations detail the manipulation of corporate machinery by directors for the sole or primary purpose of perpetuating themselves in office, the test of *Aronson* is met and demand is excused. *See Schnell v. Chris-Craft Industries, Inc.,* Del.Supr., 285 A.2d 437, 439 (1971); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906, 914 (1980); *Petty v. Penntech Papers, Inc.,* Del.Ch., 347 A.2d 140, 143 (1975); *Condec v. Lukenheimer Co.,* Del.Ch., 230 A.2d 769, 775–76 (1967). It is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, i.e., perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct.

Against this legal background plaintiffs have failed to plead any facts supporting their claim that the City board, or any subgroup thereof, rejected the Tamco offer solely to retain control. Rather, plaintiffs seek to establish a motive or primary purpose to retain control only by showing that the City board opposed a tender offer. Acceptance of such an argument would condemn any board, which successfully avoided a takeover, regardless of whether that board properly determined that it was acting in the best interests of the shareholders.

■■■■ We are not persuaded by plaintiffs' claim that the City board's refusal to accept the premium offered by Tamco, or to negotiate with Tamco under these circumstances, are prima facie breaches of fiduciary duty and hence, excuse demand. Establishing such a principle would rob corporate boards of all discretion, forcing them to choose between accepting any tender offer or merger proposal above market, or facing the likelihood of personal liability if they reject it. To put directors to such a Hobson's choice would be the antithesis of the principles upon which a proper exercise of business judgment is demanded of them. The ultimate loss would, of course, be upon the shareholders. Here, the complaint does not overcome the presumption that the City board properly and prudently exercised its managerial discretion. Valuation studies, carefully prepared by outsiders, were presented to the board prior to its decision. A special committee of independent, outside directors was charged with gathering and analyzing this information. There is nothing in the complaint to suggest that the board's action was other than a carefully considered decision made on an informed basis. Thus, we cannot accept plaintiffs' position, either as applied to these facts, or standing alone, as a per se rule to excuse demand.

Under the standards of *Aronson,* we are satisfied that demand was not excused, and affirm the trial court's dismissal for plaintiffs' failure to comply with Rule 23.1.

\* \* \*

AFFIRMED.