# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INTER-MARKETING GROUP USA, INC., Derivatively on Behalf of PLAINS ALL AMERICAN PIPELINE, L.P., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 2017-0030-TMR |
| GREGORY L. ARMSTRONG, HARRY N. PEFANIS, AL SWANSON, CHRIS HERBOLD, BERNARD FIGLOCK, EVERARDO GOYANES, GARY R. PETERSON, JOHN T. RAYMOND, ROBERT V. SINNOTT, J. TAFT SYMONDS, CHRISTOPHER M. TEMPLE, PLAINS ALL AMERICAN GP LLC, PLAINS AAP, L.P., AND PAA GP LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| PLAINS ALL AMERICAN PIPELINE, L.P., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 2, 2019
Date Decided: January 31, 2019

Theodore A. Kittila, HALLORAN FARKAS & KITTILA LLP, Wilmington, Delaware; Gregory M. Nespole and Correy A. Kamin, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York; *Attorneys for Plaintiff.*

Srinivas M. Raju and Matthew W. Murphy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael C. Holmes, Craig E. Zieminski, Kimberly R.

McCoy, and Jeffrey Crough, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendants and Nominal Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

Nominal defendant is a Houston-headquartered Delaware master limited partnership that owns thousands of miles of pipelines in North America.  In 2015, one of nominal defendant's pipelines leaked, resulting in an oil spill in a picturesque, environmentally sensitive part of the California coast.

The consequences of the spill for nominal defendant have been substantial. Nominal defendant faced fines, criminal convictions, a federal securities lawsuit, and clean-up costs in the hundreds of millions of dollars, only some of which was insured.  Nominal defendant also lost revenue while the pipeline was out of service, suffered reputational harm, and saw a decline in its stock market price.

Plaintiff, a unitholder in nominal defendant, now brings a derivative suit for breaches of fiduciary duty, waste of corporate assets, entitlement to contribution, breach of contract, and breach of the implied covenant of good faith and fair dealing against various entities and individuals that plaintiff claims managed nominal defendant.  Plaintiff alleges that defendants did not properly oversee nominal defendant, missed numerous warning signs indicating the risk of a spill, caused nominal defendant to violate the law, and cost nominal defendant huge sums of money.  Defendants move to dismiss, arguing that they operated nominal defendant in accordance with the terms of the partnership agreement and that under the terms of that agreement, plaintiff may not bring this case.  As further explained herein, I

1

grant defendants' motion to dismiss because plaintiff failed to make demand or to show that demand is excused as futile.

## I. BACKGROUND

I draw all facts from the Verified Unitholder Derivative Complaint (the "Complaint"), the documents attached to it, and the documents incorporated by reference into the Complaint.[1] At this stage of the proceedings, I must take all of Plaintiff's well-pled facts as true and draw all reasonable inferences in its favor.

### A. Pertinent Parties and Non-Parties

Plaintiff Inter-Marketing Group USA, Inc., is and at all relevant times has been a unitholder of nominal defendant Plains All American Pipeline, L.P. ("Plains" or the "Company").[2]

Plains is a publicly traded Delaware master limited partnership headquartered in Houston, Texas, whose units trade on the New York Stock Exchange.[3] Plains's general partner is Defendant PAA GP LLC ("General Partner"), a Delaware limited liability company.[4] The sole member of General Partner is Defendant Plains AAP,

---

[1] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *DeLuca v. AccessIT Gp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010))).

[2] Compl. 13.

[3] *Id.*

[4] *Id.*

L.P., ("AAP"), a Delaware limited partnership.[5]  The general partner of AAP is Defendant Plains All American GP LLC ("Plains GP").[6]  EMG Investment, LLC, KAFU Holdings & KA First Reserve, and Oxy Holding Company hold limited partnership interests in AAP.[7]

The same officers and directors manage Plains GP and Plains.[8]  All relevant officers and directors held office from the alleged injury through the filing of the Complaint.[9]  The Plains GP and Plains boards had the same ten members, eight of whom are named in the Complaint (the "Director Defendants").  Defendant Gregory L. Armstrong was the Chairman of the Board of Directors and the Chief Executive Officer of Plains GP.[10]  Three of the Director Defendants—Bernard Figlock, John T. Raymond, and Robert V. Sinnott—were employees of, major customers of, or

---

[5]     *Id.*

[6]     *Id.* at 14.

[7]     *Id.*

[8]     Plains GP and Plains always had the same board members.  Compl. 26.  The formalities, however, have changed over time.  On November 15, 2016, before Plaintiff filed its Complaint, the Plains Entities (including Plains, General Partner, AAP, Plains GP, and other affiliates) simplified their structure, consolidating their boards into one board with oversight for both Plains GP and Plains.  Defs.' Opening Br. Ex. 2, at 5.

[9]     *See* Defs.' Opening Br. Ex. 2, at 8 (explaining that the board of directors consisted of ten members as of December 31, 2016, prior to the Complaint, and expanded to twelve in February 2017, after the Complaint).

[10]    Compl. 15.

3

investors in, the various Plains entities. Figlock served as Vice President and Treasurer of Occidental Petroleum Corporation, a major customer and vendor of Plains GP[11] and a subsidiary of Oxy Holding Company, a large beneficial owner of AAP.[12] Raymond served as CEO and Managing Partner of EMG Investment, LLC, which owned approximately twenty percent of AAP.[13] Sinnott served as President and CEO of Kayne Anderson Capital Advisors, an investment firm whose portfolio firms included customers of Plains.[14] Nominal Defendant did not report these four directors as independent under the New York Stock Exchange rules on the Form 10-K Plains filed with the SEC for the fiscal year ending December 31, 2014 (the "2014 10-K").[15]

Three of the Director Defendants served on the Audit Committee—Everardo Goyanes, J. Taft Symonds, and Christopher M. Temple. All three were independent directors under the rules of the New York Stock Exchange, and the Company reported them as such on its 2014 10-K.[16] One Director Defendant, Gary R.

---

[11]     *Id.* at 17-18.

[12]     *Id.* at 14.

[13]     *Id.* at 18-19.

[14]     *Id.* at 19.

[15]     *Id.* at 81; Defs.' Opening Br. Ex. 2, at 108.

[16]     Defs.' Opening Br. Ex. 2, at 108.

4

Petersen, served on the Compensation and Governance Committees.[17] The Complaint does not name the two remaining directors, Victor Burk and Bobby Shackouls.[18]

## B.    Facts

The Complaint alleges facts related to an oil spill in Santa Barbara, California, on May 19, 2015, in which Line 901[19] spilled approximately 3,400 barrels of oil onto environmentally sensitive coastal areas and into the Pacific Ocean (the "Spill").[20] The Company reported that the total cost of cleaning up the Spill was $257 million, partially offset by a $192 million insurance payout.[21] In the aftermath of the Spill, on August 7, 2015, Plains reported that its revenues had fallen by approximately 40.5% year over year, although this coincided with a decline in oil prices and likely was not entirely driven by the Spill.[22] Plains's stock price also dropped by

---

[17]    Compl. 18.  The Governance Committee consists of Symonds as Chair and Petersen. The Compensation Committee consists of Sinnott as Chair, Petersen, and Raymond.

[18]    Defs.' Opening Br. 20.

[19]    Line 901 is a 24-inch diameter pipeline that reaches approximately 10.6 miles from Exxon's onshore oil facilities at Las Flores, California, to Chevron's onshore oil facilities at Gaviota, California, where it meets and joins Line 903, another pipeline.

[20]    *See generally* Compl. 4-8.

[21]    *Id.* at 48.

[22]    *Id.* at 12.

approximately 40% in the aftermath of the Spill and had not recovered as of the time Plaintiff filed the Complaint.[23]

In May 2016, authorities in California indicted Plains on forty-six criminal charges in Santa Barbara County related to the Spill (the "California Action").[24] On September 7, 2018, a jury found Plains guilty of eight misdemeanors and one felony (the "California Conviction").[25] The felony conviction was for "the crime of KNOWINGLY DISCHARGING OIL, OR REASONABLY SHOULD HAVE KNOWN THAT ITS ACTIONS WOULD CAUSE THE DISCHARGE OF OIL, INTO THE WATERS OF THE STATE."[26] One misdemeanor was for "the crime of KNOWINGLY FAILING TO FOLLOW A MATERIAL PROVISION OF AN

---

[23]    *Id.*

[24]    *Id.* at 72.

[25]    Plaintiff requests that this Court take judicial notice of the convictions under Delaware Uniform Rules of Evidence 201(b)(2) and 201(d) and attaches press releases about the convictions to this request. Defendants do not dispute this Court's power to take judicial notice of the convictions but argue that the convictions are irrelevant. Defendants also argue that if this Court does take judicial notice, it should take notice of the jury verdict forms, which they attached, not press releases. Plaintiff agrees that the jury verdict forms are informative but argues that the press releases are as well. Because I find that the convictions are "not subject to reasonable dispute" and they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" under Delaware Uniform Rule of Evidence 201(b) and the jury forms are more informative, I grant Defendants' request, deny Plaintiff's request, and will consider the jury forms.

[26]    Defs.' Resp. to Pl.'s Mot. Requesting Judicial Notice of Criminal Conviction Ex. A, at 1.

6

APPLICABLE OIL CONTINGENCY PLAN" (the "Knowing Misdemeanor").[27]

The rest were for misdemeanors related to unlawful taking of animals and discharging oil with no expression of intent.[28]

### C.    Procedural History

Plaintiff filed its Complaint on January 17, 2017.[29] On February 6, 2017, Roger Kirby, Linda Greenberg, and the Firemen's Retirement System of St. Louis moved to intervene in and stay the action, arguing that the outcome of this case might prejudice their related and prior-filed books and records action.[30] On March 3, 2017, Defendants filed their motion to dismiss.[31] On April 7, 2017, Plaintiff filed its Answering Brief in Opposition to Defendants' Motion to Dismiss.[32] On April 17, 2017, I granted the motion to stay.[33] On August 8, 2017, I ordered the production of

---

[27]    *Id.* at 3.

[28]    *Id.* at 3-9.

[29]    Compl. 1.

[30]    Mot. of Roger Kirby, Linda Greenberg, and the Firemen's Retirement System of St. Louis to Intervene In and Stay Deriv. Action 2-3.

[31]    *See* Defs.' Mot. to Dismiss.

[32]    *See* Pl.'s Answering Br.

[33]    Order Granting Mot. of Roger Kirby, Linda Greenberg, and the Firemen's Retirement System of St. Louis to Intervene In and to Stay Deriv. Action.

certain books and records in the related books and records action.[34] On March 16, 2018, the parties to the books and records action agreed that no outstanding issues remained in that litigation.[35] On July 31, 2018, I lifted the stay in this case.[36] On September 24, 2018, Plaintiff filed a motion requesting judicial notice of the Company's criminal conviction in California related to the Spill.[37] On October 12, 2018, Defendants filed their Reply in Support of their Motion to Dismiss, completing briefing on that motion.[38] On November 2, 2018, the Court held oral argument on the motion to dismiss, which is now before me.[39]

## II. ANALYSIS

Plaintiff brings this action derivatively on behalf of Nominal Defendant alleging breaches of fiduciary duty, waste of corporate assets, entitlement to contribution, breach of contract, and breach of the implied covenant of good faith and fair dealing. Defendants move to dismiss for failure to make demand or plead demand futility under Court of Chancery Rule 23.1 and for failure to state a claim

---

[34] Order Lifting Stay and Governing Briefing and Arg. on Defs.' Mot. to Dismiss the Deriv. Compl. 3.

[35] *Id.*

[36] *Id.*

[37] Pl.'s Mot. Requesting Judicial Notice of Criminal Conviction.

[38] Defs.' Reply Br.

[39] Oral Arg. Tr. 1.

8

under Court of Chancery Rule 12(b)(6). For the reasons that follow, I dismiss the action for failure to make demand or to show that demand is excused as futile.

"As a general matter, much of the well-developed corporate law that exists with respect to the demand requirement has been applied by analogy in the limited partnership context."[40] "[T]he issues in determining demand futility for partnership law appear identical to those in corporation law."[41] Thus, I rely heavily on the well-developed law in the corporate context.

Court of Chancery Rule 23.1 requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[42] Stated differently, a plaintiff

---

[40] Martin I. Lubaroff & Paul M. Altman, *Lubaroff & Altman on Delaware Limited Partnerships* § 10.3 (2018); s*ee Litman v. Prudential-Bache Props., Inc.*, 1993 WL 5922, at *2-3 (Del. Ch. Jan. 4, 1993) ("The defendants assert that none of plaintiffs' arguments allege with particularity facts establishing demand futility . . . . The statutory test for determining derivative actions in the partnership context is almost identical to case law language in the corporations context. . . . Therefore, the issues in determining demand futility for partnership law appear identical to those in corporation law.").

[41] *Litman*, 1993 WL 5922, at *3; *see also Ishimaru v. Fung*, 2005 WL 2899680, at *12 (Del. Ch. Oct. 26, 2005) ("This court has recognized, despite the statutory basis for demand in the limited partnership context, that 'the issues in determining demand futility for partnership law appear identical to those in corporation law' and, therefore, has applied the familiar test for corporate demand futility." (quoting *Litman*, 1993 WL 5922, at *3)).

[42] Ct. Ch. R. 23.1.

seeking to assert claims on behalf of a corporation must (1) make pre-suit demand on the company or (2) show demand futility.[43]  The demand requirement serves to "insure that a stockholder exhausts his intracorporate remedies,"[44] "provide a safeguard against strike suits,"[45] and "assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur."[46]  Where, as here, the plaintiff has failed to make a pre-suit demand on the board,[47] the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[48]

Two Delaware Supreme Court cases articulate the tests for demand futility. *Rales v. Blasband*[49] applies when the plaintiff challenges an action not taken by the board that would consider the demand; *Aronson v. Lewis*[50] applies when the plaintiff

---

[43]    Ct. Ch. R. 23.1(a); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

[44]    *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

[45]    *Id.* at 812.

[46]    *Kaplan*, 540 A.2d at 730 (citing *Aronson*, 473 A.2d at 811-12).

[47]    Compl. 79.

[48]    *Ryan v. Gursahaney*, 2015 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Del. 2015).

[49]    634 A.2d 927, 934 (Del. 1993).

[50]    473 A.2d 805.

10

challenges an action taken by the board that would consider the demand.  Under

*Rales*, to successfully plead demand futility, a plaintiff must allege particularized

facts raising a reasonable doubt that "the board of directors could have properly

exercised its independent and disinterested business judgment" in response to the

demand.[51]  Under *Aronson*, to successfully plead demand futility a plaintiff must

allege particularized facts sufficient to raise a reasonable doubt that "(1) the directors

are disinterested and independent [or] (2) the challenged transaction was otherwise

the product of a valid exercise of business judgment."[52]  Fundamentally, *Aronson*

and *Rales* both "address the same question of whether the board can exercise its

business judgment on the corporate behalf" in considering demand.[53]  The

"[d]emand futility analysis 'is conducted on a claim-by-claim basis.'"[54]

Here, the parties agree that *Rales* applies.  Under *Rales*, "a court must

determine whether or not the particularized factual allegations of a derivative

stockholder complaint create a reasonable doubt that, as of the time the complaint is

---

[51]     634 A.2d at 934.

[52]     473 A.2d at 814.

[53]     *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug.
31, 2016).

[54]     *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71
(quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June
26, 2014)).

11

filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand."[55] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[56] A plaintiff may prove a lack of independence by alleging facts that create "a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[57]

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."[58] Further, "[u]nder *Rales*, defendant directors who face a substantial likelihood of personal liability are deemed interested in the transaction and thus cannot make an impartial decision."[59] Under that theory, "a stockholder plaintiff must plead facts

---

[55]   *Rales*, 634 A.2d at 934.

[56]   *Id.* at 936 (quoting *Aronson*, 473 A.2d at 816).

[57]   *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006).

[58]   *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)).

[59]   *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *12.

12

establishing a sufficient connection between the corporate trauma and the board such that at least half of the directors face 'a substantial likelihood of personal liability.'"[60]

## A. Plaintiff Fails To Adequately Allege That a Majority of the Directors Are Interested

Plaintiff argues that the Director Defendants cannot impartially consider demand because they are interested due to a substantial likelihood of personal liability.[61] Defendants counter that the limited partnership agreement eliminates common law fiduciary duties, which form the basis for the substantial risk of personal liability that Plaintiff identifies; thus, Defendants argue, no possibility of personal liability exists.[62] Plaintiff's argument fails.

"A partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership . . . ."[63] The operative Fourth Amended and Restated Agreement of Limited Partnership of Plains All American Pipeline (the "LP Agreement") addresses the application of fiduciary duties as follows:

---

[60] *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (quoting *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)).

[61] Pl.'s Answering Br. 9.

[62] Defs.' Opening Br. 3.

[63] 6 *Del. C.* § 17-1101(f).

13

Any standard of care and duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited, to the extent permitted by law, as required to permit the General Partner to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision pursuant to the Authority prescribed in this Agreement, so long as such action is reasonably believed by the General Partner to be in, or not inconsistent with, the best interests of the Partnership.[64]

The Delaware Supreme Court addressed functionally identical language in *Norton v. K-Sea Transportation Partners L.P.*[65] The relevant portion of the agreement in *Norton* reads:

Any standard of care and duty imposed by [the LPA] or [DRULPA] . . . shall be modified, waived or limited, to the extent permitted by law, as required to permit [K-Sea GP] to act under [the LPA] . . . and to make any decision pursuant to the authority prescribed in [the LPA], so long as such action is reasonably believed by [K-Sea GP] to be in, or not inconsistent with, the best interests of the Partnership.[66]

The only difference between the language in this case and the language in *Norton* is the defined terms. The Supreme Court held in *Norton* that "Section 7.10(d) eliminates any duties that otherwise exist and replaces them with a contractual fiduciary duty—namely, that K-Sea GP must reasonably believe that its action is in

---

[64]    Defs.' Opening Br. Ex. 1 § 7.10 (d).

[65]    67 A.3d 354 (Del. 2013).

[66]    *Id.* at 361 (alterations in original).

14

the best interest of, or not inconsistent with, the best interests of the Partnership."[67]

Here, as in *Norton*, the partnership agreement eliminates common law fiduciary

duties.

Plaintiff argues that the LP Agreement modifies (instead of eliminates)

fiduciary duties, leaving room for its common law fiduciary duty claims.[68] Plaintiff

cites *In re Kinder Morgan, Inc. Corporate Reorganization Litigation*[69] for the

proposition that "this contractual language [in Section 7.10(d)] does not

unconditionally eliminate common law fiduciary duties. Rather, it imposes 'a

condition precedent to the effectiveness of the provisions of the [Partnership]

Agreement that purport to modify, waive, or limit standards of care or duties

otherwise imposed by law.'"[70]   In *Kinder Morgan*, Vice Chancellor Laster

interpreted language in a limited partnership agreement that was also functionally

identical to the language before me now.[71]  Vice Chancellor Laster stated that "[a]s

interpreted by *Norton*, [the language] eliminates all common law fiduciary duties

---

[67]     *Id.* at 362.

[68]     Pl.'s Answering Br. 21.

[69]     2015 WL 4975270 (Del. Ch. Aug. 20, 2015), *aff'd sub nom. Haynes Family Tr. v. Kinder Morgan G.P. Inc.*, 135 A.3d 76 (TABLE) (Del. Mar. 10, 2016).

[70]     Pl.'s Answering Br. 21-22 (quoting *Kinder Morgan*, 2015 WL 4975270, at *5 n.1).

[71]     *Kinder Morgan*, 2015 WL 4975270, at *5.

and substitutes in their place a contractual duty under which the General Partner 'must reasonably believe that its action is in the best interest of, or not inconsistent with, the best interests of the partnership.'"[72]  In a footnote, Vice Chancellor Laster noted that "[a]bsent *Norton*, I would hold that the plain language of [the agreement] establishes a condition precedent to the effectiveness of the provisions of the [agreement] that purport to modify, waive, or limit standards of care or duties otherwise imposed by law  . . . .  But *Norton* is controlling."[73]  Plaintiff's argument that this footnoted dicta, which explicitly defers to *Norton*, controls in place of *Norton* is unconvincing at best.

Plaintiff also relies on *Brinckerhoff v. Enbridge Energy Company, Inc.*[74] Plaintiff argues that the Delaware Supreme Court in *Brinckerhoff* held that "[i]f the general partner failed to act in the best interest of the Partnership, a condition precedent to the modification of fiduciary duties failed to occur, and arguably common law fiduciary duties would then apply to the general partner."[75]  Again, Plaintiff cites dicta taken out of context.  As the Supreme Court in *Brinckerhoff* carefully explained, "[a]lthough the accuracy of [the] interpretation" of the language

---

[72]     *Id.*

[73]     *Id.*

[74]     159 A.3d 242 (Del. 2017).

[75]     Pl.'s Answering Br. 22 (quoting *Brinckerhoff*, 159 A.3d at 253 n.31).

present in *Norton*, *Kinder Morgan*, and *Brinckerhoff* "is the subject of legitimate debate, we choose in this case not to upset *Norton*'s settled interpretation of [the agreement]. Thus, we will not reinterpret [the agreement] . . . ."[76] The Supreme Court added a footnote explaining the argument Vice Chancellor Laster made in *Kinder Morgan*, acknowledging the Vice Chancellor's logic, but explicitly declining to adopt it and overturn *Norton*.[77] Plaintiff now cites *Brinckerhoff*'s discussion of Vice Chancellor Laster's language in *Kinder Morgan* as if it were the Supreme Court's holding; it is not. Thus, contrary to Plaintiff's contention, the Supreme Court's holding in *Norton* remains controlling law, and I must follow it. *Norton* holds that the operative language of the LP Agreement eliminates common law fiduciary duties in favor of contractual duties.

Based on the LP Agreement and the Delaware Supreme Court's jurisprudence, Plaintiff cannot demonstrate demand futility due to the directors' substantial likelihood of personal liability for breach of fiduciary duty. Put simply, the directors cannot face a substantial likelihood of personal liability for breaching

---

[76]     *Id.* at 253.

[77]     *Id.*

17

duties they do not owe.[78]  Because the fiduciary duties claims fail as a matter of law,

the waste[79] and entitlement to contribution[80] claims fail as well.[81]

B.  **Plaintiff Fails To Adequately Allege That a Majority of the Directors Are Not Independent**

Plaintiff argues that demand is excused as futile because the board members

lack independence to consider demand.  At all relevant times there were ten members

of the board.  Plaintiff makes no arguments regarding independence of three

directors (Peterson, Shackouls, and Burk).  Plaintiff argues that four have disabling

business and pecuniary interests (Armstrong, Figlock, Raymond, and Sinnott).

---

[78]  Plaintiff also argues "the modification of fiduciary duties in the [LP] Agreement only applies to *indemnification . . .* and therefore protects them only for liability for *monetary damages*," and therefore equitable remedies remain available under the LP Agreement.  Pl.'s Answering Br. 14.  Plaintiff seeks no equitable remedies, so I need not address the issue and decline to do so.

[79]  Waste derives from common law fiduciary duties; thus, the LP Agreement forecloses the ability to bring a waste claim.  *See, e.g.*, *Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007) ("Claims of waste are sometimes misunderstood as being founded on something other than a breach of fiduciary duty.  Conceived more realistically, the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule.").

[80]  The contribution claim depends on an underlying breach of fiduciary duty.  Because there is no such breach, the contribution claim fails.

[81]  Plaintiff also cites the standard to state a claim for breach of contractual duties under *Brinckerhoff*.  But Plaintiff fails to argue in a non-conclusory fashion that the Director Defendants face a substantial likelihood of personal liability for breach of contractual duties or the implied covenant of good faith and fair dealing.  *See* Pl.'s Answering Br. 13-16.

18

Plaintiff argues that the remaining three (Goyanes, Symonds, and Temple) lack independence because they are on the Audit Committee. For the reasons explained below, I hold that Plaintiff fails to allege particularized facts sufficient to create a reasonable doubt as to the three Audit Committee members who together with Peterson, Shackouls, and Burk constitute a majority of the board of directors.

"[T]he independence inquiry requires us to determine whether there is a reasonable doubt that any one of these . . . directors is capable of objectively making a business decision to assert or not assert a corporate claim against [defendant]."[82] "Delaware law is clear that directors are presumed to be independent for purposes of evaluating demand futility."[83] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[84] "Such extraneous considerations or influences may exist when the challenged director is controlled by another."[85] "Put differently, a director is not independent if particularized facts support a reasonable inference that she 'would be more willing to risk . . . her reputation than risk the relationship with

---

[82] *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

[83] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *11 (Del. Ch. July 26, 2018).

[84] *Aronson*, 473 A.2d at 816.

[85] *Orman*, 794 A.2d at 24.

19

the interested [person].'"[86]   This requires an inquiry into "whether a particular [director] . . . lacks independence because he is controlled by another."[87]

Plaintiff makes no actual independence allegations under the standard I have articulated.  Instead, Plaintiff rehashes its interest arguments.  In particular, Plaintiff claims that the three Audit Committee directors cannot properly consider demand for two reasons:  their membership on the Audit Committee and their cognitive bias.[88]  Even if these arguments presented challenges to independence, they would fail.

Plaintiff argues that Goyanes, Symonds, and Temple "start out as outside directors who presumably could give impartial consideration to a demand."[89] Plaintiff argues, however, that as members of the Audit Committee they were "responsible for monitoring the compliance by the Partnership with legal and regulatory requirements" and because the Company violated legal and regulatory requirements—which the Audit Committee is responsible for enforcing—"good reasons exist to doubt the independence of" Goyanes, Symonds, and Temple.[90]

---

[86]   *Sciabacucchi*, 2018 WL 3599997, at *11 (quoting *Beam*, 845 A.2d at 1050).

[87]   *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (emphasis omitted).

[88]   *See* Pl.'s Answering Br. 17-19.

[89]   *Id.* at 18.

[90]   *Id.* (citation omitted).  Plaintiff does not allege particularized facts that the Audit Committee, the full board, or anyone else at the Company adopted a business

20

It is settled Delaware law that membership on a committee responsible for decisions subject to challenge does not call into question a director's impartiality.[91] As this Court has held, "the fact that a director previously approved a challenged transaction is one of many factors that standing alone or without more will not call

strategy to run the Company in a manner violative of the law. *But cf. City of Birmingham Retirement and Relief System v. Good*, 177 A.3d 47 (Del. 2017) (Strine, C.J., dissenting) ("I find that the facts pled raise a pleading stage inference that it was the business strategy of Duke Energy, accepted and supported by its board of directors, to run the company in a manner that purposely skirted, and in many ways consciously violated, important environmental laws . . . . This, fiduciaries of a Delaware corporation, may not do." (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (gathering sources for the proposition that "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.' As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.")))). *See also Desimone*, 924 A.2d at 934-35 ("[I]t is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct.") (citation omitted); *Louisiana Mun. Police Empls. Ret. Sys. v. Pyott*, 46 A.3d 313, 352, *rev'd on other grounds*, 74 A.3d 612 (Del. 2013) ("The plaintiffs in this case have alleged a direct connection between the Board and a business plan premised on illegal activity.").

91   *See In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *39 n.43 (Del. Ch. Jan. 25, 2016) (quoting *Stein v. Orloff*, 1985 WL 11561, at *3 (Del. Ch. May 30, 1985) ("Mere allegations of participation in the approval of the transaction are similarly insufficient" to establish a lack of independence.); quoting *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) ("[T]he mere approval of a corporate action, absent any allegation of particularized facts supporting a breach of fiduciary duty or other indications of bias, will not disqualify the director from subsequently considering a pre-suit demand to rectify the challenged transaction.")).

into question a director's ability to consider a demand."[92]  This "reflects an expectation that a director can be sufficiently open-minded to reflect on a prior decision and potentially assess it in a new light."[93]  Further, it "has a practical component:  Were the rule otherwise, then absent a change in board composition, the demand requirements of our law would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance."[94]  Thus, the Director Defendants' membership on the Audit Committee does not show a lack of independence.

Relying on *In re Ezcorp Inc. Consulting Agreement Derivative Litigation*,[95] Plaintiff next argues that because the Audit Committee failed in its responsibility to enforce compliance, "cognitive bias suggest[s] that they would continue to act in a manner consistent with that course of action as a means of resisting any information that they had made bad decisions in the past."[96]  This argument misstates Vice Chancellor Laster's discussion of cognitive bias in *Ezcorp*.  In *Ezcorp*, Vice Chancellor Laster first acknowledges that "[g]enerally speaking, 'mere directorial

---

[92]     *Ezcorp*, 2016 WL 301245, at *39.

[93]     *Id.*

[94]     *Id.*

[95]     2016 WL 301245 (Del. Ch. Jan. 25, 2016).

[96]     Pl.'s Answering Br. 18 (citing *Ezcorp*, 2016 WL 301245, at *40).

22

approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim . . . is insufficient to excuse demand."[97]  When the Vice Chancellor considered demand futility in the context of eight annual agreements for advisory services between Ezcorp Inc. and Madison Park, an entity owned by Ezcorp Inc.'s controller, however, he wrote that

> for a director to have continued to approve a series of similar transactions, after an indication that the course of action might not be in the best interests of the corporation, deserves some consideration in the Rule 23.1 analysis. One need not delve deeply into the extensive research on cognitive bias that has developed since *Aronson* to learn that.[98]

In the case before me, Plaintiff fails to identify an equivalent series of identical or similar actions (or inactions) that the directors knew or had indications might not be in the best interest of the corporation.  Therefore, *Ezcorp* is not comparable to this case.

Plaintiff concedes that it has made no attempt to make demand on the board.[99] Because Plaintiff has not adequately pled that demand is futile based on the Director Defendants' interestedness or their lack of independence, dismissal is appropriate under Court of Chancery Rule 23.1.

---

[97]     *Ezcorp*, 2016 WL 301245, at *39.

[98]     *Id.* at *40.

[99]     Compl. 79.

23

## III. LEAVE TO AMEND IS APPROPRIATE

Because I concluded above that the Complaint should be dismissed for failure to plead demand futility, the last issue for consideration is whether that dismissal shall be with or without prejudice as to Plaintiff's ability to amend its complaint. Under Rule 15(aaa),

> a party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed. In the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice (and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only) unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances.[100]

Plaintiff has shown good cause supporting a finding that dismissal with prejudice would be unjust under these circumstances. Plaintiff argues that approximately two years have gone by since it filed its complaint and Answering Brief in Opposition to the Motion to Dismiss. During that time a felony and various misdemeanor criminal verdicts have come down in California.[101] Plaintiff suggests it could use information

---

[100]  Ct. Ch. R. 15(aaa).

[101]  Oral Arg. Tr. 55:4-13.

24

from new developments to "make probably a tighter nexus between the [board] and what's happened."[102] Plaintiff details some of the new information derived from testimony in the California Action in its papers.[103] I hold that Plaintiff has shown good cause that dismissal with prejudice would not be just under all the circumstances, and Plaintiff may amend its complaint to reflect new developments.

## IV. CONCLUSION

For the foregoing reasons, the Complaint is dismissed without prejudice.

**IT IS SO ORDERED**.

---

[102] Oral Arg. Tr. 54:23-24.

[103] Pl.'s Reply in Further Supp. of its Mot. Requesting Judicial Notice of Criminal Conviction.